JAMES F. MCKAY III, Judge.
 

 _J/This appeal from a jury verdict in a personal injury action involves a work-related accident where the plaintiff sustained serious injuries. Issues involving comparative negligence, statutory employers, and loss of consortium are also involved. We affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 On May 21, 2004, Lawrence Ritter was involved in a work-related accident from which he incurred numerous injuries, including having his left arm crushed, shredded, and ultimately amputated; Mr. Ritter also suffered a broken leg and cervical injuries. At the time of the accident, which occurred at the ExxonMobil refinery in Chalmette, Mr. Ritter was employed as a pipefitter by Maintenance Enterprises, Inc. (MEI). MEI was an independent contractor retained by the ExxonMobil Corporation (ExxonMobil) to perform additional labor for maintenance at the Chal-mette refinery. At the time of the acci
 
 *543
 
 dent, Mr. Ritter was under the direction and supervision of a Kellogg Brown & Root (KBR) employee. 12KBR is an embedded contractor at the refinery and has the responsibility of supporting the operations, maintenance, and new construction within the facility.
 

 The ExxonMobil refinery in Chalmette makes both gasoline and petroleum coke. The equipment used to make petroleum coke includes three vertically stacked heat exchangers and a furnace. The heat exchangers are cylinder shaped and over twenty feet long. They are composed of piping or coiled tubes called a bundle. Hot liquid runs on one side of the tubes and cool liquid runs on the other side. The tubes are encased in a covering called the “shell.” Periodically, these shells must be replaced. The task of the scheduling of and the replacement of these shells was entrusted to KBR by ExxonMobil.
 

 As early as November of 2003, KBR and its planner Mr. Devitt recognized that replacing the shells on the three vertically stacked heat exchangers in the Coker II Unit would require highly specialized skill due to the tight working conditions and overhead restrictions. Mr. Devitt contacted StarCon, a company specializing in the removal of heat exchangers. StarCon placed a bid of $22,000.00 to replace the bundles; StarCon would have used a highly specialized piece of equipment known as a crawler extractor to perform the work. However, StarCon’s bid was rejected by KBR and ExxonMobil.
 

 In May of 2004, a valve malfunctioned in the furnace of the Coker II Unit. This malfunctioning valve caused over one hundred pipes in the furnace to clog up with petroleum coke. This necessitated a shut down of the Coker II Unit. ExxonMobil and KBR decided to take advantage of this unexpected shutdown and Ralso replace the shells on the heat exchanger units. ExxonMobil assigned two KBR employees, Bill Johnson and Dean Thibodeaux, to supervise the job and to ensure quality, efficiency, and safety. Both Mr. Johnson and Mr. Thibodeaux had over twenty years of experience dealing with this type of maintenance.
 

 Because ExxonMobil had rejected Star-Con’s bid to perform this work, another plan was necessary. Dennis Diaz, Exxon-Mobil’s lift coordinator, and an engineer came up with a plan to use a large crane and hook the crane to the back side of the exchanger to pull all three shells, including bundles, out in one lift and to place them on the wash pad. Bill Johnson and Dean Thibodeaux came up with an alternative plan to use two small cranes to pull the bundles first and then remove the shells. ExxonMobil chose to go with Mr. Diaz’s plan.
 

 At the shift change meeting at 6:00 p.m. on May 20, 2004, Mr. Diaz announced to the ExxonMobil and KBR supervisors present that that the heat exchanger was to be unbolted, blinded, and prepared for removal. Immediately following the shift change meeting, Bill Johnson quit. Mr. Johnson warned Mr. Thibodeaux not to authorize a work order safety work permit to remove any of the bundles from the heat exchanger with a forklift because it was dangerous.
 

 ExxonMobil requested that MEI bring a crew of pipefitters, which included Mr. Rit-ter, to begin blinding and unbolting the heat exchanger. The MEI independent contract workers were not allowed to perform any work within the refinery without first getting a work order safety permit from either an ExxonMobil supervisor or a KBR supervisor. It appears that either Sonny Purvis, |.,the ExxonMobil supervisor, or Dean Thibodeaux, the KBR supervisor, decided to pull the bundles from the heat exchanger that night rather than wait
 
 *544
 
 for the large crane to arrive the following morning. Because none of the MEI pipe-fitters had ever pulled bundles from a heat exchanger before, Mr. Thibodeaux told them what equipment to use, where to place the equipment and how to pull the bundles. Having only one small crane available, Mr. Thibodeaux decided to substitute the second small crane with an extended boom forklift. Mr. Thibodeaux’s instructions to the MEI crew were in violation of ExxonMobil’s policies and procedures concerning forklifts.
 

 Part of the job that night required an MEI crew member to climb a ladder and measure the midpoint of the bundle and place a strap around the midpoint to be connected to the hook of the crane. As Mr. Ritter was approaching the ladder to locate the midpoint, the strap that was being used by the forklift to hold up the bundle broke and the bundle fell, striking the ladder first, then Mr. Ritter’s left arm. Mr. Ritter fell to the ground; his left arm was crushed and his left leg broken. Mr. Ritter was then taken to the emergency room at Charity Hospital.
 

 As a result of the accident, Mr. Ritter suffered numerous injuries. In addition to the amputation of part of his arm and the insertion of a metal plate, Mr. Ritter had to undergo reconstructive surgery of his left upper extremity with multiple operations to remove dead chunks from his arm involving multiple closures and skin grafts. Mr. Ritter also underwent a cervical fusion at C5-6 and shoulder surgery at the AC joint. Mr. Ritter continues to suffer from phantom Lpain, insomnia, sleep disorders, major depression and post-traumatic stress disorder.
 

 On December 29, 2004, Mr. Ritter and his wife, on behalf of themselves and their minor children, filed suit against Exxon-Mobil, Chalmette Refining LLC (CRLLC), KBR, Braud Company, B & G Crane Service, Inc., and ARS. Prior to trial, the plaintiffs settled with ARS and dismissed their claims against Braud Company and B & G Crane Service, Inc. The trial court also heard cross-motions for partial summary judgment filed by the parties on whether ExxonMobil and CRLLC were Mr. Ritter’s statutory employers. The trial court granted the plaintiffs’ motion and denied that of the defendants. On April 21, 2008 through May 1, 2008, the matter was tried before a jury. At trial, the parties put on numerous fact and expert witnesses.
 

 On May 1, 2008, the jury returned a verdict apportioning the percentages of fault as follows: 35% to KBR, 25% to ExxonMobil, 20% to Mr. Ritter, and 20% to MEI. General damages were awarded to Mr. Ritter in the amounts of $1,600,000.00 for past physical pain and suffering; $1,700,000.00 for future physical pain and suffering; $500,000.00 for past mental anguish and suffering; $500,000.00 for future mental anguish and suffering; and $250,000.00 for disfigurement and scarring. General damages for loss of consortium were awarded to Janice Ritter in the amount of $250,000.00; to Gage Ritter in the amount of $50,000.00; to Tanner Ritter in the amount of $50,000.00; and to Heather Raspberry in the amount of $50,000.00. Mr. Ritter was awarded special damages |nin the $453,538.00 for past medical; expenses; $4,962,144.00 for future medical and life care expenses; $270,600.00 for lost income to date; and $628,667.00 for the impairment of earning capacity. Thereafter, the plaintiffs filed a motion for judgment not withstanding the verdict, which the trial court denied. On August 11, 2008, the trial court entered a judgment based on the jury’s verdict.
 
 [1]
 
 
 *545
 
 ExxonMobil and KBR now appeal. The plaintiffs answered the appeal.
 

 DISCUSSION
 

 On appeal, ExxonMobil raises three assignments of error: 1) the trial court erred by ignoring the terms of the applicable contract and basic principles of contract law in finding that CRLLC and ExxonMo-bil were not entitled to the statutory employer defense under La. R.S. 23:1032 and La. R.S. 23:1061; 2) the trial court erred by refusing to allow the jury to assess the fault of a settling defendant, ARS, when it had previously ruled the jury should assess ARS fault; and 3) the trial court erred by refusing to allow ExxonMobil and CRLLC to use evidence of the accident investigation conducted by appellee’s employer that directly contradicted appellee’s testimony at trial regarding the accident, thereby refusing to follow the law of this Circuit and prejudicing the defendants’ defense by preventing the jury from weighing this probative evidence. KBR also raises three assignments of error: 1) the trial court erred by failing to include the strap manufacturer (ARS) on the jury verdict form and by removing its name from the |7caption of the jury verdict form; 2) the trial court erred by unduly restricting evidence and questioning about MEI’s investigation of the accident; and 3) the jury erred by finding that the actions of KBR were a proximate cause of the accident. In their answer to the appeal, the plaintiffs raise the following lone assignment of error: the loss of consortium damages awarded to Mr. Ritter’s wife and children by the jury should be increased.
 

 Statutory Employer
 

 At the time of the accident, the contract establishing the relationship between MEI and ExxonMobil was the continuing services agreement that was executed between them on November 1, 2000. Under the continuing services agreement, MEI was an independent contractor. Exx-onMobil concedes that its contract with MEI did not contain a statutory employer provision and in its brief to this Court, ExxonMobil states: “As an independent contractor, MEI was ultimately responsible for deciding how to perform work assignments.”
 

 ExxonMobil now attempts to argue that a subsequent amendment Oil to this contract, dated May 24, 2004, applies to retroactively change the status of MEI and establish a statutory relationship over MEI employees. This proposed amendment is dated three days after Mr. Ritter’s accident. This is not allowed under Louisiana law.
 
 See Ernest v. Petroleum Service Corp.,
 
 2002-2482 (La.App. 1 Cir. 11/19/03), 868 So.2d 96. In
 
 Ernest,
 
 the First Circuit expressly rejected a prior attempt by ExxonMobil to retroactively apply a contract amendment regarding statutory employees for one of its subcontractors.
 

 | sUnder Louisiana law, ExxonMobil’s proposed amendment 011 was an irrevocable offer and did not become effective until after Mr. Ritter’s accident. The contract amendment Oil contained an offer sent by ExxonMobil to MEI for its consideration and acceptance. The final paragraph of that proposed amendment, drafted entirely by ExxonMobil, contained a five-day period for MEI’s acceptance and a specific place to which the document was to be returned. It stated:
 

 If you are in agreement with this amendment as written, please signify your acceptance by signing the copy marked “ExxonMobil’s Copy” in the space provided below and return it within five (5) days to Global Services Corn-
 
 *546
 
 pany, attention: Danny Judge, 601 Jefferson, Houston, Texas 77002. Please retain the copy marked “Contractor Copy”, along with any attachments, for your file.
 

 Louisiana Civil Code Article 1928, entitled Irrevocable Offer, provides the following:
 

 An offer that specifies a period of time for acceptance is irrevocable during that time.
 

 When the offeror manifests an intent to give the offeree a delay within which to accept, without specifying a time, the offer is irrevocable for a reasonable time.
 

 Louisiana Civil Code Article 1934 states: “An acceptance of an irrevocable offer is effective when received by the offeror.” Therefore, the acceptance of an irrevocable offer is effective only when it is received by the offeror within the time named in the offer.
 
 Kent v. Hogan,
 
 2003-2424 (La.App. 1 Cir. 10/29/04), 897 So.2d 68. ExxonMobil admits that it did not receive MEI’s acceptance of this proposed amendment until after Mr. Ritter’s accident. Accordingly, we find no error in the jury’s finding that ExxonMobil and CRLLC were not the statutory employers of Mr. Ritter.
 

 _|<1MEI’s Accident Investigation
 

 The defendants contend that the trial court erred by not allowing them to use evidence from MEI’s accident investigation report. ExxonMobil and KBR are asking this Court to consider documents that were not offered into evidence, that were not introduced into evidence at trial, nor proffered at trial. It is well settled that “evidence not properly and officially offered and introduced cannot be considered, even if physically placed in the record. Documents attached to memoranda do not constitute evidence and cannot be considered as such on appeal.”
 
 Denoux v. Vessel Management Services, Inc.,
 
 2007-2143 (La.5/21/08), 983 So.2d 84. When the trial judge rules the evidence is inadmissible, a proffer (offer of proof) can be made. La. C.C.P. art. 1636. It is incumbent upon the party who contends his evidence was improperly excluded to make a proffer, and if he fails to do so, he cannot contend such exclusion is error.
 
 Grusich v. Grusich,
 
 447 So.2d 93 (La.App. 4 Cir.1984). In this case, no such proffer was made by either ExxonMobil or KBR. Accordingly, the defendants are precluded from raising this issue on appeal.
 

 Settling
 
 Defendant
 
 [2]
 

 ExxonMobil and KBR contend that the trial court erred in not placing ARS on the jury verdict form. Any claim against ARS would be governed by the Louisiana Products Liability Act (LPLA). In order to prove a claim under the LPLA, it must be established that a product was “unreasonably dangerous” at the time it left the possession of the manufacturer. A product can be unreasonably dangerous in the following ways. It can be (1) unreasonably dangerous in construction or composition; (2) unreasonably dangerous in design; (3) | munreasonably dangerous because it does not have an adequate warning; and/or (4) unreasonably dangerous because it does not conform to an express warranty of the manufacturer of the product.
 
 See
 
 La. R.S. 9:2800.54 — La. R.S. 9:2800.58. A mere failure of a product does not prove a design defect.
 
 Bourgeois v. Garrard Chevrolet, Inc.,
 
 2002-0288 (La. App. 4 Cir. 2/21/02), 811 So.2d 962.
 

 In
 
 Seither v. Winnebago Industries, Inc.,
 
 2002-2091 (La.App. 4 Cir. 7/2/03), 853
 
 *547
 
 So.2d 37, this Court held that when the record is devoid of any technical drawings, calculations, scientific study, photographs or publications of any engineering principals as to a proposed alternative design, an expert cannot simply present speculative concepts. In the instant case, not only was the record devoid of these types of technical evidence but no one was even offered as or accepted by the trial court as a products liability expert. As such, there was no evidence under the facts adduced at trial that ARS did anything to cause or contribute to Mr. Ritter’s injuries. Accordingly we find no error or abuse of discretion in the trial court’s excluding ARS from the jury interrogatories.
 

 KBR’s Actions as a Proximate Cause
 

 KBR contends that the jury erred by finding that its actions were a proximate cause of the accident. Whether KBR’s actions were a proximate cause of the accident is a question of fact. The Louisiana Supreme Court set forth a two-part test for the appellate review of factual determinations: (1) the appellate court must find from the record that there is a reasonable factual basis for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is not clearly wrong or manifestly erroneous.
 
 Mart v. Hill,
 
 505 So.2d 1120 (La.1987). In the instant case, KBR was an embedded | n contractor in charge of maintenance at the Chalmette refinery. The maintenance supervisor, Mr. Thibodeaux, was a KBR employee and it was his responsibility to review the job and safety requirements and confirm that all employees were trained and followed the approved procedures before issuing the work order safety work permit; Mr. Thibodeaux signed the work order in the instant case, but failed to follow the procedures. Mr. Thibodeaux instructed the MEI employees to use the extended boom forklift to remove the bundles. KBR also provided the forklift used on the job. Accordingly, we find nothing manifestly erroneous or clearly wrong in the jury’s finding that KBR’s actions were a proximate cause of the accident.
 

 Loss of Consortium
 

 In their answer to the appeal, the plaintiffs contend that the loss of consortium damages awarded to Mr. Ritter’s wife and children by the jury should be increased. Loss of consortium claims generally have the following seven items: (1) loss of love and affection; (2) loss of society and companionship; (3) impairment of sexual relations; (4) loss of performance of material services; (5) loss of financial support; (6) loss of aid and assistance; and (7) loss of fidelity.
 
 Campbell v. Webster Parish Police Jury,
 
 36,391 36,392 (La.App. 2 Cir. 9/18/02), 828 So.2d 170.
 
 See also Thonn v. Cook,
 
 2003-0763 (La.App. 4 Cir. 12/10/03), 863 So.2d 628. In the instant case, the jury awarded general damages for loss of consortium to Mrs. Ritter in the amount of $250,000.00 and $50,000.00 for each of the minor children. On appeal, a damages award cannot be disturbed absent a showing that the trier of fact abused its discretion.
 
 Clarkston v. La. Farm Bureau Cas. Ins. Co.,
 
 2007-1282 (La.App. 4 Cir. 7/2/08), 989 So.2d 164, 187. This discretion placed in the trier of fact is great and will only be disturbed in | ^exceptional circumstances. In the instant case, the jury heard testimony and considered other evidence regarding the plaintiffs’ loss of consortium claims. The jury took this evidence into account when it made these awards. Although the plaintiffs point to cases where similar injuries were incurred and the damages awarded for loss of consortium were greater, that is not enough to show an abuse of discretion. There is nothing in the record to indicate that the trier of fact, in this case, the jury, abused
 
 *548
 
 its discretion. Accordingly, we find no merit in the plaintiffs’ contention that these damages should be increased.
 

 CONCLUSION
 

 For the above and foregoing reasons, we affirm the jury’s verdict and the judgment of the court below.
 

 AFFIRMED
 

 [1]
 

 . The judgment misstated the jury's findings by stating that CRLLC and ExxonMobil were
 
 *545
 
 25% at fault when the verdict form only assigned a percentage of fault to ExxonMobil.
 

 [2]
 

 . A settlement is not admissible to prove lia-bilily.
 
 See
 
 La.Code of Evidence Article 408