# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30993

United States Court of Appeals
Fifth Circuit

**FILED**

May 30, 2017

Lyle W. Cayce
Clerk

BILLY STEWART; SHARON GILBERT,

Plaintiffs - Appellants

v.

CAPITAL SAFETY U S A; D B INDUSTRIES, INCORPORATED, incorrectly designated as Capital Safety U S A, doing business as Capital Safety U S A,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:13-CV-904

Before KING, JOLLY, and PRADO, Circuit Judges.

PER CURIAM:*

This appeal is from a district court's grant of summary judgment in favor of Capital Safety USA in a products liability suit brought by Billy Stewart and Sharon Gilbert ("Appellants") on behalf of their son Ty Stewart ("Stewart"), an oil rig derrickman who fell to his death from the mast of a drilling rig while wearing a Capital Safety fall protection body harness with a self-retracting lifeline.  Appellants challenge the district court's holdings that they did not

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-30993

provide competent summary judgment evidence that would raise a genuine dispute of material fact as to: (1) proximate causation on their defective design and inadequate warning claims; and (2) any of the other elements of their inadequate warning claim.  We AFFIRM.

## I.

On May 10, 2012, Stewart died after falling from a land-based oil rig in Caddo Parish, Louisiana.  On the night of the incident, a crew had been pulling up the rig's drill pipe in order to replace a dull bit at the leading edge of the pipe.  This process required a derrickman to climb up to the "monkey board" (the derrickman's working platform that is roughly 90 feet up the rig's 142-foot mast), remove strands from the drill pipe, and rack the strands on the monkey board's "fingerboard" (a comb-like structure containing steel "fingers" with slots between them that hold in place the tops of the drill pipe strands).

Typically, Stewart was the derrickman.  But, on the night in question, a less experienced crewmember was performing his role.  The crewmember was having difficulty moving some pipe strands, so Stewart volunteered to help him.  Stewart put on a Capital Safety body harness, climbed up to the monkey board, and attached his harness to a Capital Safety self-retracting lifeline.  This lifeline, which contained a braking mechanism and an eighty-five foot spool of 3/16th inch wire rope, was anchored to the top of the rig above the large traveling block and "top drive" motor, which together drive the drill pipe into the well.

After Stewart and the crewmember finished racking the pipe strands, Stewart radioed "I got it. Get out of here." to Jamie Womack, who was operating the drill controls at the base of the rig.  Womack interpreted Stewart's statement as meaning that Stewart and the crewmember had

completed their work and were out of harm's way, so he began lowering the traveling block and top drive to the rig's floor.

Shortly thereafter, Womack looked up, saw Stewart falling, and immediately engaged the brake that halts the traveling block and top drive's progress.  By that time, however, the top drive had already descended past the monkey board, and Stewart fell until he hit the rig's floor.  Based on the fact that the cable on Stewart's lifeline was severed, crewmembers and safety investigators concluded that the top drive had caught the lifeline's cable, pulled Stewart off balance, and severed the cable as it fell past the monkey board.

Appellants subsequently sued Capital Safety, raising defective design and inadequate warning claims under the Louisiana Products Liability Act ("LPLA").  Capital Safety moved to exclude the testimony of Appellants' engineering expert, Stephen Killingsworth, pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and simultaneously moved for summary judgment.

The district court first granted Capital Safety's *Daubert* motion.  It excluded Killingsworth's testimony on causation, defective design, failure to provide adequate warnings, and alternative anchoring systems because, the court held, Appellants did not "establish[] the admissibility of Killingsworth's opinions."[1]

Five months later, the district court granted Capital Safety's motion for summary judgment.  The court primarily predicated its decision on its holding that Appellants did not "come forward with [any] competent summary

---

[1] The court had "major concerns' about [Killingsworth's] ability to satisfy any of [the *Daubert*] requirements" because, the court found, Killingsworth "made wide-ranging, blanket statements . . . without any data or methodology to back [them] up" and "his theories on product defects and accident causation lack[ed] the reliability and testability that is required."

judgment evidence to raise a genuine dispute of material fact as to proximate causation, as required for any claim made under the LPLA."

With respect to Appellants' defective design claim, the court explained that Appellants "must be able to establish that the failure of the [lifeline] to prevent Stewart's fall was proximately caused by the defective design of the [lifeline]." Appellants "rel[ied] on Killingsworth's conclusion that [Stewart's lifeline] was severed upon coming in contact with the top drive because the [lifeline] was defective," but this argument "is now unsupported" because the court excluded Killingsworth's opinion. Moreover, the court found, none of the additional pieces of evidence that Appellants pointed to "in support of their causation position" raised a genuine dispute of material fact as to causation."[2]

As for their inadequate warning claim, the court found that Appellants again "rel[ied] on the expert testimony of Killingsworth," which the court had already excluded under *Daubert*. Furthermore, the court held, without Killingsworth's testimony, Appellants were "unable to raise any genuine dispute of material fact in relation to the requisite elements of a failure to warn under the LPLA."

Appellants have timely appealed. While their argument is not pellucid, Appellants appear to argue that the district court erred in granting summary judgment because: (1) expert testimony is not required to show causation in this case given that they may rely upon circumstantial evidence generally and *res ipsa loquitur* specifically; and (2) based on international safety standards

---

[2] Appellants cited to: (1) "standards published by the Canadian Standards Association" and "a report published by the German Institute for Occupation[al] Safety and Health in support of their argument that an alternative design exists"; (2) "Capital Safety's manufacturing of another type of [lifeline]" in support of what appears to be the argument that this "necessarily means that there was an alternative design available"; and (3) "an article published in 'Industrial Safety News' and authored by Capital Safety's Australia/NZ technical manager, Ric[k] Millar," in support of their argument "that the alternative design fall protection devi[c]e was capable of preventing Stewart's death."

and an article written by one of Capital Safety's managers, a reasonable jury could find that Capital Safety knew that its lifeline was not safe and did not provide a warning.

## II.

"This court reviews 'a grant of summary judgment de novo, applying the same standard as the district court.'" *Kinsale Ins. Co. v. Ga.-Pac., L.L.C.*, 795 F.3d 452, 454 (5th Cir. 2015) (citation omitted). But we "may 'affirm the district court's judgment on any grounds supported by the record.'" *U.S. ex rel. Farmer v. City of Hous.*, 523 F.3d 333, 338 n.8 (5th Cir. 2008) (citation omitted).

## A.

To prevail under any theory under the LPLA, Appellants must establish four elements: (1) Capital Safety manufactured the lifeline at issue; (2) Stewart's death "was proximately caused by a characteristic of the [lifeline]"; (3) "this characteristic made the [lifeline] 'unreasonably dangerous'"; and (4) Stewart's death "arose from a reasonably anticipated use of the [lifeline] by [Stewart] or someone else." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 260–61 (5th Cir. 2002); *accord* LA. STAT. ANN. §§ 9:2800.54(A), (D). Thus, if Appellants have not raised a genuine dispute of material fact as to each element, that failure is fatal to both their defective design and inadequate warning claims.

We begin with the overarching issue in this appeal: whether the district court erred in holding that Appellants have not raised a genuine dispute of material fact as to the second element—proximate causation.

We first address whether Appellants must adduce expert testimony to show causation in this case. Expert testimony is, Appellants argue, neither required in LPLA cases generally nor needed in this case, even though it involves technical matters. After all, "Products' Liability claims nearly always

involve technical, arcane matters, and it is in precisely that context that courts have repeatedly held that Plaintiffs are permitted to rely on circumstantial evidence." The district court therefore erred, they conclude, by "fail[ing] to follow or in any way acknowledge the well-established precedent holding that circumstantial evidence may suffice in demonstrating" LPLA liability. We disagree.

To be sure, expert testimony is not required in every LPLA case. Plaintiffs may sometimes "rely on lay testimony alone." *Malbrough v. Crown Equip. Corp.*, 392 F.3d 135, 137 (5th Cir. 2004). But Appellants read too much into this Court's statement "that 'there may be cases in which the judge or the jury, by relying on background knowledge and 'common sense,' can 'fill in the gaps' in the plaintiff's case' . . . without the aid of expert testimony." *Id.* (citation omitted); *accord, e.g.*, *McKey v. Gen. Motors Corp.*, 691 So. 2d 164, 170 n.2 (La. Ct. App. 1997) (citation omitted). As both this Court and Louisiana courts have recognized, for expert testimony not to be required in a products liability case, "the product itself, or at least the . . . feature in question, must be relatively uncomplicated, and the implications . . . such that a layman could readily grasp them." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 184 (5th Cir. 1990) (citations omitted), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) (en banc)); *accord, e.g.*, *McKey*, 691 So. 2d at 170 n.2. Consequently, courts consistently require expert testimony in products liability cases, even when the products in question are in common use.[3]

---

[3] *E.g.*, *Winstead v. Ga. Gulf Corp.*, 77 F. App'x 267, 271 (5th Cir. 2003) (requiring the appellant to present expert testimony to raise a fact question on causation "because the cause of [a] chemical release is beyond the understanding of an untrained lay person and because specialized, technical knowledge would assist the trier of fact in determining the cause of the chemical release"); *Krummel v. Bombardier Corp.*, 206 F.3d 548, 552 n.4 (5th Cir. 2000) (requiring expert testimony because "a layperson obviously could not have grasped the adequacy of [a] footwell design [in a watercraft] and the need, if any, for warnings");

No. 16-30993

To find injury causation here, a jury would at least have to conclude that a different lifeline cable or a different warning would have, under the circumstances of this accident, prevented Stewart's death. Thus, a jury would be confronted with questions that require a degree of familiarity with such subjects as physics, engineering, and oil rig practices and procedures. This case therefore raises questions that are of "sufficient complexity to be beyond the expertise of the average judge and juror" and that "common sense" does not "make[] obvious." *See Morgan v. Gaylord Container Corp.*, 30 F.3d 586, 590–91 (5th Cir. 1994). Accordingly, Appellants were required to provide the jury with expert testimony related to causation in order to survive summary judgment in this case.[4]

---

*Underwood v. Gen. Motors LLC*, No. CV 14-00188-BAJ-RLB, 2015 WL 5475610, at *3 (M.D. La. Sept. 17, 2015), *aff'd sub nom. Underwood v. Gen. Motors, L.L.C.*, 642 F. App'x 468 (5th Cir. 2016) (requiring expert testimony on, among other things, causation because "[w]hether or not a fuel tank or an automobile electrical system was . . . the proximate cause of driver or passenger injury, is not part of the everyday experience of the average finder of fact"); *Graham v. Hamilton*, No. CIV.A. 3:11-609, 2012 WL 1252590, at *7 (W.D. La. Apr. 12, 2012) (requiring expert testimony because "redesigning a [car's] fuel system is well beyond the realm of common sense"); *Gray v. Indus. Plant Maint.*, No. CIV.A. 01-1167, 2004 WL 1661209, at *6 n.2 (E.D. La. July 23, 2004) (requiring expert testimony "because a tractor is relatively complicated"); *Scordill v. Louisville Ladder Grp.*, LLC, No. CIV.A. 02-2565, 2003 WL 22427981, at *10 (E.D. La. Oct. 24, 2003) (requiring expert testimony when the product at issue was a ladder); *Clark v. Bohn Ford, Inc.*, 213 F. Supp. 2d 957, 961 (S.D. Ind. 2002) (applying Louisiana law and relying on Fifth Circuit precedent to require expert testimony because "[t]he design features of tires are not 'uncomplicated'"); *Bourgeois v. Garrard Chevrolet, Inc.*, 811 So. 2d 962, 966–67 (La. Ct. App. 2002) (holding that *res ipsa loquitur* was inapplicable and requiring expert testimony to show a genuine issue of material fact in a case involving a car's allegedly defective air brake system); *Batiste v. Gen. Motors Corp.*, 802 So. 2d 686, 689–90 (La. Ct. App. 2001) (holding that *res ipsa loquitur* was inapplicable and requiring expert testimony to show a genuine issue of material fact as to causation when the product at issue was a car's air bags); *McKey*, 691 So. 2d at 166–67, 170 n.2 (requiring expert testimony when the allegedly defectively designed product was a car that uncontrollably accelerated).

[4] Appellants contend that *Batiste* and *Bourgeois*—Louisiana appellate cases standing for the proposition that expert testimony is required in LPLA cases involving "technical matters"—are no longer good law in the wake of *Lawson v. Mitsubishi Motor Sales of Am., Inc.*, 938 So. 2d 35 (La. 2006), a Louisiana Supreme Court case which recognized that *res ipsa loquitur* may be used in products liability actions. Appellants' contention is without merit. All three decisions are consistent. Both *Batiste* and *Bourgeois* recognized that expert

No. 16-30993

While Appellants initially proffered a purported expert's testimony on causation, the district court excluded that testimony under *Daubert*. Appellants have clarified that they are not appealing the *Daubert* order and have never tendered another expert.

To conclude: because the causation element of their causes of action can only be established through expert testimony and Appellants have not proffered any competent expert testimony on causation, Appellants have not shown a genuine dispute of material fact as to proximate causation. And because proximate causation is an essential element of both of their LPLA claims, *e.g.*, LA. STAT. ANN. §§ 9:2800.54, Appellants' defective design and inadequate warning claims fail as a matter of law. Accordingly, the district court did not err in granting Capital Safety summary judgment.

### III.

For the forgoing reasons, the judgment of the district court is AFFIRMED.

---

testimony is not required in every LPLA case and that *res ipsa loquitur* may be used in some cases, placing restrictions on the doctrine's use that are fully consistent with *Lawson*. *Lawson*, 938 So. 2d at 43–51; *Bourgeois*, 811 So. 2d at 966–67; *Batiste*, 802 So. 2d at 689–90. Moreover, cases decided after *Lawson* still cite *Batiste* and *Bourgeois* as good law. *E.g.*, *Underwood*, 2015 WL 5475610, at *4 (citing *Bourgeois*); *Bennett v. MillerCoors, LLC*, 838 F. Supp. 2d 470, 473 (M.D. La. 2011) (citing *Batiste*).